FILED

2010 Jul-30  AM 08:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| CHRISTY HUMBERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 6:09-CV-00947-KOB |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On July 24, 2006, the claimant, Christy M. Humbers, applied for supplemental security income under Title XVI of the Social Security Act. (R.12). The claimant alleges disability commencing on December 15, 2000, and this disability resulted from an automobile accident involving the claimant. (R. 14). The Commissioner denied the claim initially on October 11, 2006. (R. 12). The claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ), and the ALJ held a hearing on February 8, 2008. *Id*. In a decision dated March 20, 2008, the ALJ found that the claimant was not disabled as defined by the Social Security Act and thus was ineligible for supplemental security income. (R. 20). On April 20, 2009, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and

1

1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether the ALJ afforded the proper weight to the treating physician's opinion in viewing the claimant's medical evidence as a whole.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. However, this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five step, sequential evaluation process:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The law in this circuit is well established that the ALJ must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician unless good cause exists for not doing so. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). An ALJ's failure to give considerable weight to the treating physician's opinion absent good cause is reversible error. *Broughton*, 776 F.2d at 961. However, the ALJ may reject the opinion of *any* physician when the evidence supports a contrary conclusion. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). The Federal Regulations define a "treating physician" as one with whom the claimant has an "ongoing treatment relationship" or someone the claimant "sees or ha[s] seen with frequency consistent with

3

accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical conditions." 20 C.F.R. § 404.1502. Although the ALJ must consider all medical opinions when making a disability determination, he does not have to accord an opinion arising out of a single consultative examination the same deference he must give to the treating physician. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

## V. FACTS

The claimant has an eleventh grade education and was twenty-six years old at the time of the administrative hearing. (R. 35). Her past work experience includes employment in the restaurant industry. (R. 43). The claimant alleges that she is unable to work because of injuries sustained in an automobile accident to her back, neck, and head, and because of debilitating migraines. (R. 40, 49-50).

### *Physical Limitations*

On December 15, 2000, the claimant sustained injuries to her back, neck, and face during an automobile collision. (R. 142). On the day of the accident, x-rays revealed thoracic and lumbar vertebral body fractures with an L1 compression fracture. (R. 146-47). The claimant was hospitalized December 15-23, 2000, at Carraway Methodist Medical Center.  The claimant's admission diagnoses were closed-head trauma; scalp laceration; occult pneumothorax; T8 and T12 fracture; and C7-T1 spinous process fracture. (R. 162).

On December 21, 2000, Dr. John Crompton, an orthopedic surgeon, performed posterior pedicle screw fixation to stabilize for arthrodesis T12 to L2; open treatment of L1 burst fracture; posterolateral arthrodesis (fusion between two adjacent vertebrae across the lamina and transverse processes) T12 to L2; and bone grafting through separate incision of a posterolateral arthrodesis. (R.

166). Dr. Crompton did not note any complications during surgery and allowed for gradual mobilization with a brace. (R. 167).

On December 23, 2000, Dr. William Harvey, an attending physician at Carraway Methodist Medical Center, discharged the claimant. Dr. Harvey noted at the time of discharge that the claimant's pain was well-controlled, and the claimant was ambulating in the hallways with the assistance of a walker. Dr. Harvey's discharge report indicated that claimant was stable at the time of discharge, and Dr. Harvey prescribed Lortab for pain. (R. 164). The discharge report further indicates that claimant was to follow-up with Drs. Crompton and Maull within two weeks of discharge. (R. 165).[1]

On January 6, 2005, Dr. Farouk A. Raquib, a general practitioner and claimant's treating physician, examined claimant. The claimant complained of recurring headaches. Dr. Raquib ordered a computerized tomography (CT) scan of claimant's head without contrast. (R. 455). On January 14, 2005, claimant underwent the CT scan at Winfield Northwest Medical Center. (R. 327-28). The CT scan revealed "normal noncontrast CT of the head." (R. 328).

On January 27, 2005, Dr. Farouk A. Raquib examined claimant, who complained of body aches and stiffness of legs and back for four to five days. Dr. Raquib prescribed Demerol and Lortab

---

[1] The court notes that no evidence exists in the record to demonstrate that the claimant had follow-up appointments with Drs. Crompton and Maull. Furthermore, no evidence exists that claimant participated in any physical therapy following her hospital stay and back surgery. After the claimant's discharge from the hospital on December 23, 2000, the record indicates several visits to the emergency room, but none of those visits pertains to the claimant's alleged disability. (R. 207-326).

for claimant's pain. (R. 451). On February 7, 2005, Dr. Raquib again examined the claimant because of claimant's complaints of body aches and stiffness of legs and back. (R. 449).

On April 8, 2005, Dr. Raquib examined claimant on a follow-up visit. Dr. Raquib noted that claimant complained of a burning sensation in her lower back area when she bends over. He also noted that claimant complained of a lateral burning sensation radiating down her left thigh. Dr. Raquib prescribed Lortab for pain and gave claimant a back exercise leaflet. (R. 446).

On May 5, 2005, Dr. Raquib examined claimant on a follow-up visit. Dr. Raquib noted that claimant has chronic lower back pain and neck pain. Claimant told Dr. Raquib that "she literally has to roll out of her bed." However, Dr. Raquib noted that the "pain is stable." (R. 444).

On June 13, 2005, claimant again presented to Dr. Raquib with lower back pain. Dr. Raquib increased claimant's medication dosage. On July 11, 2005, Dr. Raquib examined claimant. Dr. Raquib noted that claimant had lower back pain. (R. 442).

On August 9, 2005, Dr. Raquib again examined claimant. Dr. Raquib noted that claimant's pain is "worse at night and radiates down her lower legs." (R. 437). On August 24, 2005, Dr. Raquib examined claimant after she reportedly fell on August 22, 2005, hurting both legs and her lower back. Dr. Raquib ordered x-rays of the lumbar spine.  (R. 435). These x-rays of the lumbar spine revealed postsurgical changes, but "nothing acute." (R. 355).

On September 21, 2005, Dr. Raquib again examined claimant. Dr. Raquib noted that claimant had lower back pain and had difficulty sleeping. He prescribed pain medication and ordered magnetic resonance imaging (MRI) of the lumbar spine. He also noted that if the pain does not

significantly subside, he would consider a lumbar epidural block. (R. 433).

On September 28, 2005, the MRI revealed an "old mild compression deformity T12 vertebral body with pedicle screws at T11 and L1," but "the rest of the lumbar spine is normal." (R. 360-61).

On October 5, 2005, Dr. Raquib examined claimant because of persistent back pain. He referred claimant to physical therapy for a transcutaneous electrical nerve stimulation (TENS) unit treatment and home TENS unit therapy. (R. 432).

On November 1, 2005, Dr. Raquib again examined claimant because of complaints of lower back and neck pain. He noted that claimant received physical therapy, which exacerbated her neck pain. He also noted that claimant deferred surgery until January 2006. (R. 430).

On November 29, 2005, Dr. Raquib examined the claimant on a follow-up visit. Claimant complained of lower back pain. Dr. Raquib noted that the "MRI of L-Spine shows no spinal canal stenosis or herniated discs." He prescribed various medications to the claimant for pain and muscle spasms. (R. 428).

On January 2, 2006, Dr. David Pavlakovic ordered x-rays of the claimant's lumbar spine after the claimant presented to the emergency room. (R. 458, 532-37). X-rays revealed "postsurgical changes with nothing acute in the lumbar spine otherwise." (R. 458). On January 18, 2006, Dr. Raquib again examined claimant because she fell and hurt her lower back. He noted that claimant went to the emergency room on January 2, 2006, and an x-ray of the lumbar spine was apparently

negative. (R. 426).[2]

On July 7, 2006, Dr. Raquib examined the claimant after the claimant wounded her right index finger. (R. 404). During this visit, claimant informed Dr. Raquib that she rode a four-wheeler the previous weekend and developed a rash between her legs from sand. (R. 405).

Dr. Raquib examined claimant on August 4, 2006. Dr. Raquib noted that claimant complained of pain in the mid to lower back, and a burning sensation in her spine. (R. 403).

On October 3, 2006, Dr. Boyde Harrison, a general practitioner and the Social Security Administration's consulting physician, examined the claimant. (R. 540). Dr. Harrison reported that claimant walked into the examination room without difficulty. (R. 541). He further reported that claimant "could squat and arose without difficulty," and that the lumbar spine has normal extension and side bending. Dr. Harrison concluded that the claimant was able to perform work-related activities such as sitting, standing, handling, hearing, speaking and traveling. (R. 542).

Mr. Fred Thompson, a state agency consultant, who listed no medical qualifications, reviewed the claimant's record on October 11, 2006. Mr. Thompson found that "claimant sustained a back injury that required a fusion. There are no neurological deficits or loss of control due to nerve damage. She has migraine headaches." (R. 543-50).

Dr. Ted Cox, an obstetrics and gynecology specialist and one of the claimant's treating physicians, examined the claimant thirty times between the dates of September 6, 2006 and March

---

[2] The court questions the claimant's repeated falls, and the emergency room visits after these falls. No evidence exists in the medical record to indicate the reason(s) for the falls.

21, 2007. During this period of time, claimant was pregnant. (R. 611-13). On November 29, 2006, Dr. Cox noted that claimant had "constant ER and L&D visits and office calls requesting narcotics. Very suspicious for substance abuse." He further noted that he discussed the option of a pain center appointment with the claimant. Dr. Cox reported that the claimant had been examined multiple times "with no findings as [sic] the cause of her multiple somatic complaints including headaches, back pain, abdominal pain, extremity pain." (R. 612).

After presenting to the emergency room on several occasions in 2007, emergency physicians ordered x-rays of the claimant's back. On May 10, 2007, x-rays of the lumbar spine revealed postsurgical changes for a fracture of the T12 vertebral body associated with mild to moderate compression. X-rays of the thoracic spine showed a marked compression deformity in the T7 vertebral body. (R. 647). On July 21, 2007, x-rays of the lumbar spine and thoracic spine both indicated "nothing new or acute." (R. 635). On December 4, 2007, x-rays of the lumbar spine revealed that the lumbar spine was stable with postsurgical changes for a mild old compression fraction at T12 noted. (R. 620).

On January 9, 2008, Dr. Raquib ordered an MRI, which revealed that no change was present, in comparison to previous MRI studies. (R. 707). The MRI further showed stable postsurgical changes in the thoracolumbar spine with no other lumbar spine abnormalities noted. (R. 707-08).

On March 4, 2008, Dr. Raquib performed a "Physical Capacities Evaluation" on the claimant. Dr. Raquib concluded that the claimant can occasionally carry up to five pounds, but never can carry more than five pounds. During an eight-hour day, Dr. Raquib found that the claimant can sit for three

hours, stand for four hours, and walk for two hours. (R. 714).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 24). At the hearing, the claimant testified that her pain begins about mid-back and radiates down her left leg, and radiates down her right leg to about her knee. (R. 42). She testified that the pain medication helps to make her comfortable, but the pain does not completely subside. On the day of her ALJ hearing, her pain was at a level eight on a scale of one to ten. (R. 45).

The claimant testified that on some days she is unable to get out of bed. (R. 37). On days that she is able to get out of bed, she indicated that she will try and wash dishes, but she is only able to wash a few dishes before having to take a break because of the pain. (R. 38). She testified that she takes a hot bath once a week to ease her pain, and has tried back exercises and other remedies. (R. 47).

The claimant testified that she needs to get up and move around at least every fifteen to thirty minutes, and she even got up and moved around during her testimony at the ALJ hearing. (R. 51). Between the hours of 8:00 a.m. and 5:00 p.m., she testified that she lies on the couch for six of those nine hours with her "legs propped up." (R. 41). The claimant testified that she has trouble sleeping at night, and that a muscle relaxer does help her to relax so that she "can try to sleep." (R. 42). Although she testified that it hurts to pick up her twenty-pound child, she indicated that she does pick him up when necessary. She testified that she has two children, both of whom were born after

the motor vehicle collision. (R. 54).

Before the accident involving the claimant in December 2000, the claimant testified that she worked in the restaurant industry "whether it's waitressed or been in the kitchen." (R. 43). After the accident, she testified that she returned to her job in the restaurant industry, but she was able to work only two weeks because the pain level during the workday was so high. (R. 43-44). After being unable to work in the restaurant industry, the claimant testified that she began training for a customer service position, which would have required her to sit upright in a chair for eight to ten hours per day. (R. 44). After two weeks of training, she testified that she had to stop because the pain would be "so bad from [her] back and [her] hip." (R. 45).

A vocational expert, Mr. Thomas Elliott, testified concerning the type and availability of jobs that the claimant is able to perform. (R. 55-62). He stated that the claimant's past relevant work includes kitchen helper and waitress. (R. 56). The ALJ asked Mr. Elliott to assume that the claimant is a younger individual with an eleventh grade education and prior work history and training similar to the claimant's, can perform light work, and must be able to sit and stand at will during the workday. (R. 57-58). Mr. Elliott responded that under these constraints, the claimant would be precluded from performing all past work. The ALJ then asked Mr. Elliott to identify any jobs in the regional or national economy that Mr. Elliott believed the claimant could perform. (R. 58).  He replied that the claimant could work as a cashier in a cafeteria setting, a parking lot attendant, a counter clerk, or a label coder. (R. 58-60). Although Mr. Elliott just named a few examples of sit/stand option jobs, he indicated that "hundreds" of these types of jobs exist. (R. 59-60).

11

During his examination of Mr. Elliott, the ALJ also questioned the claimant as to her ability to work if she was offered a job as a cashier where she could sit and stand at will. If offered a cashier job like the ALJ described, the claimant responded that she could perform such a job. (R. 57). After the ALJ finished questioning Mr. Elliott concerning the claimant's specific employment opportunities, the claimant's attorney, Mr. Tim R. Wadsworth, examined Mr. Elliott. (R. 60-62).

Mr. Wadsworth asked Mr. Elliott to assume that an individual is required to remain on a couch with her feet elevated for six hours during the typical workday. Mr. Elliott responded that under those constraints, the individual would be precluded from any gainful employment. Furthermore, Mr. Wadsworth hypothesized an individual with moderately severe or severe pain on a consistent basis. (R. 60). Mr. Elliott again responded that "persistent pain at a moderately severe or greater level, and that would be seven or higher on a zero to ten scale," would preclude any gainful employment. (R. 60-61).

Mr. Wadsworth examined Mr. Elliott about absenteeism from the workplace because of seeking medical treatment or because of pain and discomfort. (R. 61). Mr. Elliott responded that absenteeism occurring at a rate of two or more days a month over a prolonged period would preclude any gainful employment. (R. 61-62). According to Mr. Elliott, this preclusion applies to past work and from any other type of employment. (R. 62).

*The ALJ's Decision*

On March 20, 2008, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 20). First, the ALJ found that the claimant had not engaged in substantial

gainful activity since the alleged onset of her disability. (R. 14). Next, the ALJ found that the claimant's old mild compression deformity at T12 vertebral body with pedicle screws at T11 and L1, gastroesophageal reflux disease, irritable bowel syndrome, obstipation, migraine headaches, and obstructive sleep apnea qualified as severe impairments; he concluded, however, that these impairments did not manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 14-16).

The ALJ next considered the claimant's subjective allegations of pain to determine whether she had the residual functional capacity to perform past relevant work. (R. 16). The ALJ found that the "claimant's medically determinable impairments could reasonably be expected to produce alleged symptoms," but that "[t]he medical records fail to document a sufficient objective basis to accept the claimant's allegations resulting in functional limitations as wholly credible." (R. 17). Furthermore, the ALJ determined that the "[m]edical evidence shows the claimant has underlying medical conditions, but it does not support her allegations of severe and chronic pain and limitation of function to the degree that it would preclude the performance of all substantial gainful activity." (R. 18).

To support his conclusion, the ALJ first referenced the treatment notes of Dr. Cox. The ALJ noted that Dr. Cox suspected substance abuse, and that Dr. Cox found that "claimant 'has been evaluated multiple times with no findings as the cause of her multiple somatic complaints including headaches, back pain, abdominal pain, extremity pain.'" The ALJ found that Dr. Harrison's consultative evaluation indicated no noteworthy disabilities. (R. 18).

13

The ALJ rejected Dr. Raquib's opinion of disability because "[t]he final responsibility for deciding the issue of disability is reserved to the Commissioner of the Social Security Administration." Specifically, the ALJ determined that "Dr. Raquib's assessment that the claimant can lift only five pounds occasionally and that she can 'never' lift six to 10 pounds is in direct conflict with the claimant's testimony about lifting her 20-pound child, for whom she is the sole caregiver." The ALJ found that "the claimant's participation in riding a four-wheeler also directly contradicts her testimony of chronic, debilitating pain and dysfunction that keeps her mostly homebound." (R. 18).

The ALJ did not give "great weight" to Mr. Fred Thompson. *Id.* The ALJ did, however, agree with Mr. Thompson's "findings that the claimant cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; and occasionally can balance, stoop, kneel, crouch, and crawl, as consistent with the medical evidence of record." (R. 19).

From the ALJ's review of Dr. Harrison's findings, the ALJ determined that the consultative physician found that "the claimant is able to perform work activities such as sitting, standing, handling, hearing, speaking, and traveling." The ALJ gave "considerable weight" to Dr. Harrison's assessment of the claimant. (R. 19).

The ALJ agreed with the vocational expert "that an individual with the claimant's residual capacity could not perform . . . past relevant work." *Id.* The ALJ stated that "[i]f the claimant had the residual capacity to perform the full range of light work, a finding of 'not disabled' would" be appropriate; however, "the claimant's ability to perform all or substantially all of the requirements

14

of this level of work has been impeded by additional limitations." (R. 19-20). The ALJ questioned the vocational expert regarding these "additional limitations" and the availability of jobs in the national market considering the limitations. (R. 58-60).

The ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 20). Therefore, the ALJ determined that the claimant is not disabled under the Social Security Act. *Id*.

## VI. DISCUSSION

The claimant argues that the ALJ committed error in failing to afford substantial weight to the treating physician's opinion in viewing the claimant's medical evidence as a whole. To the contrary, this court finds that the ALJ properly considered the medical evidence of record and explained the weight afforded each physician.

In this case, the ALJ recognized that the claimant suffers from an underlying medical condition capable of generating pain; however, he found that the entirety of the medical evidence failed to support the claimant's alleged severity of pain. Furthermore, the ALJ found that the claimant's "allegations are inconsistent with the claimant's daily living activities . . . ." (R. 18).

The ALJ properly credited the opinion of Dr. Cox, one of the claimant's treating physicians, and clearly articulated his reasons for doing so. The ALJ properly considered Dr. Cox's opinion that "the claimant 'has been evaluated multiple times with no findings as the cause of her multiple

somatic complaints including headaches, back pain, abdominal pain, extremity pain.'"[3] *Id*. The ALJ further properly determined that "[t]he medical evidence of record shows little objective findings to support the claimant's allegations of debilitating pain." *Id*.

The ALJ properly discredited Dr. Raquib's disabling opinion of the claimant and clearly stated two reasons for giving Dr. Raquib's opinion little weight. First, the ALJ determined that "Dr. Raquib's assessment that the claimant can lift only five pounds occasionally and that she can 'never' lift six to 10 pounds is in direct conflict with the claimant's testimony about lifting her 20-pound child, for whom she is the sole caregiver." *Id*. Second, the ALJ stated that the claimant "reportedly requested cream for a rash between her legs from sand while riding a four-wheeler."*Id*. Consequently, the ALJ determined that riding a four-wheeler in July 2006 "directly contradicts [claimant's] testimony of chronic, debilitating pain and dysfunction that keeps her mostly homebound." *Id*.

The ALJ properly considered the other medical evidence of record. The ALJ noted that Dr. Harrison's examination of the claimant showed that she had normal range of motion in the shoulders, elbows, and wrists. *Id*. Furthermore, the ALJ accepted Dr. Harrison's determination that the claimant's "lumbar spine had normal extension and side bending." *Id*. The ALJ properly considered all the medical evidence and found that Drs. Cox's and Harrison's diagnoses and findings were

---

[3] This court expresses uncertainty regarding Dr. Cox's evaluation of the claimant's orthopedic and neurologic issues because Dr. Cox is an obstetrics and gynecology specialist. The claimant raised an issue regarding Dr. Cox's evaluation of the claimant, but the claimant only expressed concern with regard to time, and not the substance of Dr. Cox's evaluation. The court finds that Dr. Cox was one of the claimant's treating physicians, and this court has weighed the evidence accordingly.

consistent with the evidence as a whole. Therefore, good cause exists to support the ALJ's decision

in discrediting Dr. Raquib's conclusions and giving greater weight to the opinions of Drs. Cox and

Harrison.

## VII. CONCLUSION

For the reasons stated above, the court concludes that the decision of the Commissioner is

supported by substantial evidence and is due to be AFFIRMED. The court will enter a separate order

to that effect simultaneously.

DONE and ORDERED this 30th day of July 2010.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

17